WALLING, Administrator of Wage and Hour Division, Department of Labor, v. SANDERS et al.

No. 209.

District Court, Middle District. Tennessee, Nashville Division.

Sept. 1, 1942.

Jeter S. Ray and James H. Hynes, both of Nashville, Tenn., for plaintiff.

W. M. Fuqua and J. Ross Cheshire, Jr., both of Nashville, Tenn., for defendants.

DAVIES, District Judge.

The cause was heard upon the entire record of the cause, including the testimony of witnesses in open Court, and the introduction of certain documentary evidence, and after hearing argument of counsel, the Court makes and files the following Findings of Fact and Conclusions of Law.

### Findings of Fact.

1. The defendants are, and at all times since October 24, 1938, have been a co-partnership doing business under the name and style of G & S Distributing Company; said partnership is composed of H. R. Sanders and C. E. Glasgow, and has its principal office and place of business in Nashville, Tennessee. It is engaged in two distinct and separate types of business; one phase of the business is the wholesale distribution and sale of several different brands of beer, and the other phase is the sale and distribution of automatic phonographs and vending machines.

2. As to defendants' beer business, the Court finds that they purchased their beer

from breweries located in St. Louis, Missouri, Cincinnati, Ohio, and Evansville, Indiana, and send their own trucks to those breweries to obtain the beer and transport it to their warehouse in Nashville. The beer is purchased by the truck driver when he arrives at the brewery. He gives an order for the number of cases of beer wanted and it is loaded on the truck and checked and subsequently paid for. When the beer arrives in Nashville the truck is driven into the warehouse owned by the defendant and is unloaded on the platform. It is then moved into the warehouse where it is stored for varying periods of time. In the summer when the demand is greater, the beer does not stay in the warehouse more than several days or a week, before it is loaded onto the route trucks and sold to the retailers. In the winter it remains on the floor of the warehouse and in stock for a longer period of time.

3. The defendants' brewery truck drivers take from twenty-four to thirty hours to make a round trip from Nashville to the out-of-state breweries and at the time defendants began the beer business, they paid the drivers $7.00 a trip; this was later raised to $8.00 a trip, and they are now receiving $9.00 a trip. The drivers in the beginning helped unload the brewery trucks on their arrival at the warehouse, but the unloading is now done entirely by warehouse men and special delivery men.

One of these warehouse employees worked from 8:00 A. M. and 6:00 A. M. on alternate days until 8:00 P. M., and was off on alternate Sundays, at which time he employed a man to work in his place at his own expense. First he was paid $7.00 a week; then $8.00 a week; then $12.00 a week, and finally $15.00 a week. This is generally the situation relative to all warehouse employees, some working as many as eighty-four hours per week.

4. The defendants distribute their beer to retailers by trucks which have fixed routes and the defendants employ salesmen to go out with each route truck and sell the beer to the retailers. The drivers of the trucks help unload the beer when it is sold, and collect the empty bottles and cases in the same proportion as the beer sold. The empty bottles are not always the same ones originally delivered to the retail customers and many times are of different color. They are taken back to the warehouse and there sorted and all brown bottles placed in one case and all clear bottles placed in another and then loaded on the defendants' trucks and returned to the breweries.

When defendants obtain a load of beer from the breweries they are required to make a deposit with the brewery for the cases and bottles, and on the return of the bottles and cases, they are given credit against the deposit. The deposit required to be made amounts to more than the profit realized on the sale of the beer. When the beer is purchased by defendants from the brewery in the first instance, there is a definite sale and transfer of title.

5. The usual course of business of defendants is to load their route trucks with beer taken from the floor of their warehouse, however, in a few isolated cases, when their stock was low, defendants have loaded beer directly on the route trucks from the brewery trucks.

Defendants also purchase beer from a concern located in Milwaukee, Wisconsin, that is shipped to them by freight cars and on its arrival in Nashville is switched onto a side track within a short distance of defendants' place of business and is then unloaded and stored in defendants' warehouse by their employees. Until the War Production Board banned the use of cans as beer containers a short time ago, about ninety (90%) per cent of the beer obtained from Milwaukee was contained in cans rather than bottles, and also a small percentage of the other brands handled by defendants was contained in cans.

6. The various breweries whose products are handled by defendants do all the mass-media advertising in the territory in which defendants sell their products and also maintain permanent representatives in the territory who work out of defendants' office and render sales assistance to them, spending a large portion of their time accompanying the salesmen on the route trucks in an effort to boost sales. These representatives also make their own calls on the retail trade, occasionally take orders for deliveries of beer, which they turn over to defendants, and procure for defendants approximately half of the new accounts to whom defendants sell beer.

7. Defendants sell their beer to retailers, at wholesale prices for the purpose of resale to the ultimate consumer.

Defendants are engaged in the distribution and sale of beer in about sixteen counties in Tennessee and their beer is sold ex-

12

clusively in those counties of the State and none is sold in any other States.

8. As to the other phase of defendants' business, i. e., the phonograph business, I find that defendants have the exclusive rights of sale and distribution of the Wurlitzer phonographs in Tennessee and parts of Kentucky and Alabama and that this type of phonograph machine is operated by placing a five (5¢) cent coin in a slot attached to the machine which causes the automatic playing of certain records contained in the machine. The Court finds that from ninety-eight (98%) per cent to ninety-nine (99%) per cent of these machines are sold to operators who sometimes purchase as many as from five to one hundred machines and that a small percentage of those machines are sold to owners of restaurants, drug stores, private homes, etc.

These machine operators place the machines in various amusement places and carry on the operation of the machines therein and receive a certain percentage of the coin intake by the machines. The balance of the coin intake goes to the proprietor of the establishment wherein they are placed. Defendants sell these machines directly to the operators at a standard price, varying according to the model and type of machine. These machines are not sold to the operators for resale, but are sold for use in their business as operators. The Court finds that the so-called operators of these machines are the ultimate consumers.

9. Defendants sell machines at only one price and an operator pays the same price as the purchaser of a machine for his own private use in his home would pay. Defendants maintain a display room for their machines and sell machines to anyone who desires to purchase one. Defendants also keep and sell spare parts which are of a standard make and can be used in repairing both their make of machines and other types of machines.

Defendants' phonograph business is an entirely distinct and different business from the beer business, and has separate books, bank account, office, personnel, etc.

The Court finds that about ninety (90%) per cent of the phonograph business is done wholly within the State of Tennessee in intrastate commerce, and only about ten (10%) per cent done out of the State of Tennessee.

10. The Court further finds, in respect to the phonograph end of defendants' busi-

ness, that defendants maintain a parts supply room and repair shop where machine parts are sold to various operators of said machines, or to anyone who wants to come there and buy. Machines are repaired at both the shop and on location. Defendants also handle what is known as "remote control equipment" used as a part of said phonograph machines and maintain men to install and service this type of equipment. Defendants charge for all service work done on machines, as well as installation and servicing of remote control equipment, and installation and service charges are in addition to the cost of the machines. Machine service is rendered anyone desiring it.

Defendants have a lady employee whose duties are to maintain a stock of phonograph records, play them to prospective customers and sell them to the general public. These records are all purchased and sold wholly within the State of Tennessee at retail and one price, which price is the same that would have to be paid if purchased at any other retail store.

Defendants transport these phonograph machines from a factory in the State of New York, to Nashville, Tennessee, by their own truck.

11. During the period beginning October 24, 1938, to the date of the filing of the complaint herein on May 5, 1941, defendants did not maintain any time records of the hours worked by their employees.

Conclusions of Law.

1. The Court has jurisdiction of the parties hereto and of the subject matter of this action. 29 U.S.C.A. § 217.

2. The employees of defendants who hauled beer across state lines, who unloaded beer from company trucks on which it was hauled from the brewery and from freight cars in which it was shipped into Tennessee consigned to defendants, and who loaded empty bottles onto the company truck which took them back to the brewery outside Tennessee all performed duties of an interstate character and were engaged in commerce within the meaning of the Fair Labor Standards Act for any week in which they were so engaged and were entitled to the benefits of the Act for such employment.

3. Defendants' business of selling beer in Tennessee is an intrastate business and employees engaged therein, whose activities related solely to the handling of

beer after it had been unloaded and had come to rest at defendants' warehouse, were not engaged in commerce within the meaning of the Fair Labor Standards Act and are not entitled to the benefits of said Act.

4. Though defendants and some of their employees in the department of business devoted to the sale of automatic vending machines and parts and to the repair of such machines are to a certain extent engaged in commerce within the meaning of the Fair Labor Standards Act, that department of defendants' business is a "retail or service establishment", within the meaning of the exemption contained in Section 13 (a) (2) of the Fair Labor Standards Act, 29 U.S.C.A. § 213 (a) (2), even though the market for said commodity is necessarily limited, and the employees engaged therein, including the truck driver who hauled phonographs from New York to defendants' place of business in Tennessee, are not entitled to the benefits of Sections 6 and 7 of said Act, 29 U.S.C.A. §§ 206, 207.

5. By paying those of their employees who were engaged in commerce, in the sale and distribution of beer, as indicated, wages at rates less than the minima prescribed in the Act, defendants have violated Sections 6 and 15(a) (2) of the Fair Labor Standards Act of 1938, 29 U.S.C.A. §§ 206, 215(a) (2).

6. By paying those of their employees who were engaged in commerce, in the sale and distribution of beer, as indicated, compensation at rates less than one and one-half times the minimum rates prescribed by the Act, or less than one and one-half times their regular rate of pay, whichever the case may be, for hours worked in excess of 44 hours per week from October 24, 1938, through October 23, 1939, and for hours worked in excess of 42 hours per week during the period from October 24, 1939, to October 23, 1940, and for hours in excess of 40 hours per week thereafter to the date the complaint was filed herein, defendants have violated sections 7 and 15(a) (2) of the Fair Labor Standards Act of 1938, 29 U.S.C.A. §§ 207, 215(a) (2).

7. By their failure to make, keep and preserve records as to said employees, setting forth the information required to be recorded by regulations of the Administrator which became effective October 24, 1938, and amendments thereto; and, more particularly by their failure to record the hours worked each workday and each workweek by their employees who were engaged in commerce as above set forth, defendants violated the provisions of Sections 11 (c) and 15(a) (5) of the Fair Labor Standards Act, 29 U.S.C.A. §§ 211(c), 215(a) (5); Code of Federal Regulations, Title 29, Chapter V., Part 516.

8. Upon the whole record the plaintiff is entitled to the issuance of an injunction restraining defendants from further violations of the Act as to those matters set out in Conclusions 5, 6, and 7 hereof.

Judgment will be entered accordingly.